# In the United States Court of Federal Claims

No. 21-1186C

(Filed Under Seal: July 1, 2021)

(Reissued: July 12, 2021)[1]

|  |  |
|---|---|
| SIERRA NEVADA CORPORATION, | ) |
| *Plaintiff,* | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| *Defendant,* | ) |
| and | ) |
| SIKORSKY AIRCRAFT CORPORATION, | ) |
| *Defendant-Intervenor.* | ) |

*Marques O. Peterson*, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C., for Plaintiff. With him on the briefs were *J. Matthew Carter, Richard B. Oliver,* and *Dinesh C. Dharmadasa*, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, CA.

*David M. Kerr*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With him on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, *Martin F. Hockey, Jr.*, Acting Director, *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and *Erika L. Whelan Retta*, Commercial Litigation Field Support Center, United States Air Force, Joint Base Andrews, MD.

---

[1] On July 1, 2021, the Court issued an unredacted version of this opinion and order under seal. ECF No. 44. On July 8, 2021, Plaintiff filed a joint proposed redacted version. ECF No. 45. After considering the parties' proposed redactions, this Court reissues this public version of the July 1, 2021, opinion and order.

*Marcia G. Madsen*, Mayer Brown LLP, Washington, D.C., for Defendant-Intervenor. With her on the briefs were *David F. Dowd* and *Cameron R. Edlefsen*. Also on the briefs was *Heather A. Bloom*, Lockheed Martin Corporation, Bethesda, MD.

## OPINION AND ORDER

*SOLOMSON*, Judge.

Plaintiff, Sierra Nevada Corporation ("SNC"), challenges the decision of Defendant, the United States – acting by and through the United States Air Force ("Air Force" or "Agency") – to award a multi-year, $980 million dollar, sole-source contract to the Defendant-Intervenor, Sikorsky Aircraft Corporation ("Sikorsky"). The purpose of the contract is to perform capability upgrades ("CU") for the Combat Rescue Helicopter ("CRH"), an advanced, multi-engine rotary wing aircraft. The Air Force determined that only Sikorsky has the present capability to perform the necessary upgrades in the absence of a technical data package ("TDP")[2] that the Air Force is concerned will not be available to other potential offerors in a timely manner. The Court concludes that while a sole-source contract award to Sikorsky generally is supported by the administrative record in this case, the duration of the contract award is improper, and permanent injunctive relief is warranted.

Accordingly, and for the reasons explained below, the court **GRANTS** SNC's motion for judgment on the administrative record, **DENIES** the government's motion for judgment on the administrative record, and **DENIES** Sikorsky's motion for judgment on the administrative record.

## I.    Factual Background[3]

In 2014, the Air Force awarded a contract to Sikorsky to develop the CRH to replace an aging fleet of Pave Hawk aircraft. AR 2. That contract includes an engineering and manufacturing development phase, a low rate initial production phase, and a full rate production phase. *Id*. Over the past five and half years of Sikorsky's work on the CRH development contract, "the requirements baseline has continued to

---

[2] A technical data package "[n]ormally includes technical design and manufacturing information sufficient to enable the construction or manufacture of a defense item component modification, or to enable the performance of certain maintenance or production processes." *See* https://samm.dsca.mil/glossary/technical-data-package-tdp. For the CRH upgrade contract, the TDP includes information such as interface control documents and wiring diagrams that are specific to the requested modifications. AR 136.

[3] This background section constitutes the Court's findings of fact drawn from the administrative record. Citations to the administrative record (ECF No. 13, as supplemented and amended by ECF Nos. 20–21) are denoted as "AR."

evolve, driving the need for planning in support of a new contract vehicle to address a broad spectrum of known and undefined operational capabilities." *Id*.

During the summer of 2019, the Air Force determined that the CRH's capabilities required updating "to ensure it can counter modern threats and perform its critical [Personnel Recovery/Combat Search and Rescue] mission." *Id*. On October 1, 2019, the Air Force issued a Sources Sought Synopsis ("SSS") indicating that the Agency was "officially conducting market research that will be used to assess the ability of companies and industry at large to perform development, integration, verification, production, and installation of a broad spectrum of capability upgrades." AR 3, 51. The Air Force identified seventeen "CRH Capability Upgrade Candidates" and sought responses to twenty-one questions – many of which required check-box style answers rather than narrative replies – intended to help "determine the acquisition strategy for a prospective CRH capability upgrade contract." AR 3, 51–58. SNC submitted its response to the SSS on October 19, 2019. AR 290–99. [***] other companies also submitted timely responses to the SSS by its October 25, 2019 deadline. AR 3.

On October 29, 2019, the Air Force posted a notice for a CRH Capability Upgrades Industry Day on the Federal Business Opportunities website. AR 3, 60–67. [***] companies, including SNC, responded with registration requests to attend the event. AR 3.

On November 20 and 21, 2019, the Air Force held the in-person Industry Day event. AR 3, 67–88. In a general overview session on the morning of November 20, 2019, the Air Force summarized the program's requirements baseline, preliminary acquisition strategy overview, and pre-award schedule. AR 3–4, 71, 77–86. The Air Force also held one-on-one sessions to allow each prospective industry source to "[s]ummarize [their] qualifications and capabilities in response to Government requirement[s,] [r]eview gaps/risks in response to draft requirement set [and] [p]resent questions and/or seek clarifications." AR 4, 87.

SNC participated in both the general session and a one-on-one session. AR 4, 324. During SNC's one-on-one presentation – as well as in its October 2019 response to the SSS– SNC focused on a single capability upgrade requirement, Degraded Visual Environment ("DVE"), "which was only one of over ten preliminary CRH CU candidates." AR 11, 350. "Given the extensive work history between the Air Force and SNC, specifically in the [Intelligence, Surveillance, Reconnaissance and Special Operations Forces] (ISR/SOF) directorate, the Air Force noted that SNC might want to go back and take a look at its capabilities since it only addressed one capability (DVE)."[4] AR 11, 34.

---

[4] Based on the Air Force's market research, the Agency also "decided to hold a virtual Industry Day for Small Business participants" to determine if a small business set-aside was appropriate

Subsequently, a [***] program office team of engineers, program managers, contracting personnel and other subject matter experts evaluated the industry data, which included the SSS responses, internet searches, reviews of company websites, and discussions with other government sources. AR 5, 138–39, 145. The team evaluated each respondent's capabilities and experience in the "development, integration, installation . . ., and verification of capabilities into large or small DoD or commercial rotary or fixed wing aircraft." AR 5, 96, 145. The team assigned the following ratings to describe each respondent's capabilities and experience: little to no, limited, moderate, significant, or maximum. AR 5. The Air Force identified [***] "capable vendors," including SNC, meaning that each was "evaluated as capable of performing required development contract activities to include development, integration, and verification," *assuming the availability of a TDP.* AR 98.

On March 16, 2020, the Air Force's CRH acquisition team held an Early Strategy and Issues Session ("ESIS") to, amongst other things, summarize the market research and confirm courses of action for the CRH contract structure. AR 6, 90–116. The ESIS team identified each of the industry sources and confirmed a basis for competition, noting that "[i]ndustry feedback verified need for full [TDP] to implement candidate CU requirements." AR 97–98.

The Agency is uncertain regarding when it will have the full TDP to provide to potential CRH upgrade offerors. On one hand, the Agency represents that Sikorsky must provide the complete TDP pursuant to its current CRH development contract, referred to as the Original Equipment Manufacturer ("OEM") contract. AR 20–21, 360. On the other hand, that TDP is currently unavailable both because Sikorsky's the TDP delivery due date has not yet arrived and because of a nascent dispute between the government and Sikorsky over data rights. AR 144, 360–61. While the government initially indicated that Sikorsky was obligated to provide a TDP by late spring 2021, the government now estimates that "[***] is the earliest Sikorsky could deliver a complete and useable TDP[.]" AR 360–61. The government insists, however, that it "has not granted Sikorsky relief from the contractual requirement to deliver the TDP" and "will respond appropriately if Sikorsky fails to meet its contractual delivery requirements." AR 361. There is no evidence in the record that Sikorsky has not met its contractual requirements or otherwise does not intend to meet its contractual requirements to provide the TDP. Nor is there any evidence in the record that the TDP is likely to be unavailable for an extended duration. Indeed, there is no evidence in the record regarding how long it might take for Sikorsky to provide the TDP assuming a prolonged data rights dispute.

for the CRH upgrade contract. AR 4, 26. On January 29, 2020, the Air Force sent each of the [***] interested small businesses follow-up questions to assess their capabilities and core competencies and offered each a 30-minute follow-up virtual meeting. AR 4–5, 137. The Air Force ultimately determined that a small business set-aside was not possible. AR 5, 137.

Accordingly, the ESIS team discussed various contract vehicles in order to address and mitigate the unavailability of the OEM TDP. AR 6. The ESIS team identified four different, possible courses of action and listed their advantages and disadvantages: (1) a sole-source indefinite delivery/indefinite quantity ("ID/IQ") contract, (2) a single competitive ID/IQ contract, (3) a multiple award contract competitive ID/IQ contract, and (4) a single award competitive "C" contract. AR 6, 101. According to the ESIS team, each option except for the sole-source ID/IQ contract "[***]." AR 101.

The ESIS team ultimately recommended awarding a sole-source ID/IQ contract to Sikorsky because it "[***]." AR 6–7, 102. The team qualified its recommendation by noting the expectation that the "[***]." AR 102. On March 26, 2020, after the ESIS briefing with the Program Executive Officer, the Contracting Officer ("CO") finalized and signed the Market Research Report. AR 7, 117–139. On April 28, 2020, the CO signed a Justification and Approval ("J&A") document, which authorized the sole-source ID/IQ award to Sikorsky and represents the Agency's decision at issue in this case. AR 140–48.

During that timeframe, on March 18, 2020, SNC's Vice President of Business Development, [***], informed the CO that SNC was preparing an update to its original SSS response. AR 353. Mr. [***] inquired if the Agency would be open to receiving this update, and, if so, what the deadline would be. *Id*. The administrative record contains no evidence that the CO ever responded to this inquiry.

On May 15, 2020, almost two months after the CO approved the J&A, SNC submitted a second response to the SSS. AR 299. In SNC's second response, SNC provided narrative answers to each of the SSS questions and reiterated its ability to "[***] remove *a lot* of the data requirements." AR 313 (emphasis added). SNC did not clarify or attempt to quantify what it meant by "a lot," nor did SNC indicate with any particularity which components could be [***]. *Id*. Moreover, SNC admitted that one of its top "three challenges to on-time completion of development, integration, and verification requirements" would be "[t]imely access to proprietary OEM Technical Data Packages (TDP) and related technical systems." AR 312. On May 27, 2020, the Contracting Officer confirmed receipt of SNC's second submission in response to the SSS. AR 327.

On January 19, 2021, the Service Acquisition Executive signed the J&A, representing the final decision of the Agency to move forward with the sole-source ID/IQ contract to Sikorsky. AR 8, 140–41. The J&A describes the contemplated award as "a five-year order period ID/IQ contract with an estimated ceiling of $980.7M. The contemplated delivery period for the ID/IQ is seven years." AR 142. The J&A claims that a sole-source contract is currently necessary because "Sikorsky is the only contractor in possession of the technical expertise [and] technical data, . . . to

successfully perform these critical processes and meet the full range of CU requirements." AR 143. According to the J&A, a "delay in award of the CU contract to any other source or the attempt to award absent a complete TDP would result in unacceptable delays in fulfilling [the Air Force]'s requirements." AR 144. The J&A further promises that "[t]he CRH Program Office [will] pursue competition when the necessary data becomes available." AR 9, 143. The Court confirmed during oral argument, however, that the Air Force's putative commitment in the J&A to engage in competition, once the TDP is available, is entirely voluntary and unenforceable against the government by any future protestor. Tr.[5] 17:13–18:5.

On February 11, 2021, the Air Force posted a Notice of Contract Action on beta.SAM.gov with a redacted J&A. AR 9, 215–27. On February 22, 2021, SNC filed a protest with the Government Accountability Office ("GAO") challenging the Air Force's decision to award a sole-source contract to Sikorsky. AR 10, 228. SNC withdrew its GAO protest on April 2, 2021. ECF No. 1 ("Compl.") ¶ 40.

## II. Procedural History

On April 12, 2021, SNC filed its complaint in this Court. Notwithstanding that SNC divided its complaint into five counts, the thrust of both SNC's complaint and its motion for judgment on the administrative record – and thus SNC's central claim – is that the Agency's decision to sole-source the work at issue to Sikorsky is arbitrary, capricious, or otherwise contrary to law.[6] SNC seeks permanent injunctive relief and "any further relief that the Court deems appropriate." Compl. at 33.

On April 13, 2021, Sikorsky filed an unopposed motion to intervene, which this Court granted. ECF No. 10. On April 16, 2021, the government filed the administrative record in this matter. ECF No. 13. On May 7, 2021, SNC filed its motion for judgment on the administrative record. ECF No. 23 ("Pl. MJAR"). That same day, the

---

[5] "Tr." refers to the transcript of oral argument proceedings conducted on May 27, 2021.

[6] In Count I of its complaint, SNC asserts that the Air Force failed to meaningfully consider its capabilities, rendering the J&A deficient. Compl. ¶ 46. SNC asserts in Count II that the Air Force violated the Federal Acquisition Regulation ("FAR") by not updating the J&A after the Agency received SNC's May 15, 2020 submission further addressing the SSS. Compl. ¶ 51. In Count III, SNC asserts that the Air Force unreasonably determined that Sikorsky was the only source that could satisfy the Agency's requirement. Compl. ¶ 55. In Count IV, SNC asserts that Air Force did not satisfy its obligation to engage in reasonable advance planning. Compl. ¶ 65. All of these counts are merely arguments challenging the Agency's sole-source decision as embodied in the J&A. SNC further asserts in Count V that the Air Force violated the Anti-Deficiency Act. Compl. ¶ 72. In SNC's response brief, however, SNC formally withdrew its assertion that the Air Force violated the Anti-Deficiency Act. Pl. Resp. at 26 n.16. Given that SNC abandoned this claim, the Court does not address it further.

government filed its motion to dismiss count five of SNC's complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and a cross-motion for judgment on the administrative record on the remaining counts. ECF No. 24 ("Def. MJAR"). Sikorsky also filed its cross-motion for judgment on the administrative record. ECF No. 22 ("Intv. MJAR"). On May 21, 2021, the parties filed their respective response briefs. ECF Nos. 29 ("Intv. Resp."), 30 ("Pl. Resp."), 31 ("Def. Resp.").

On May 27, 2021, the Court held oral argument on the parties' pending motions. Minute Entry, May 27, 2021. On May 28, 2021, the Court directed the government to complete the administrative record with documents to support specific factual assertions in the J&A relating to the TDP, or, in the alternative, to file a status report certifying that no additional administrative record documents existed. ECF No. 32. Additionally, the Court instructed each party to file a supplemental brief addressing whether any legal authority supports the proposition that there must be some connection – beyond the applicable standard of review contained in the Administrative Procedure Act ("APA") – between the scope of the J&A in support of a sole-source contract, on the one hand, and the scope or duration of the intended sole-source contract vehicle, on the other. *Id.*

On June 4, 2021, the government filed a status report and a motion to explain the administrative record in response to the Court's May 28, 2021, Order. ECF Nos. 35 and 35-1. The government, in its status report, indicated that no additional documentation existed to support several of the Air Force's factual assertions in the J&A. ECF No. 35. As part of the government's motion to explain the administrative record, the government submitted two new declarations: one from [***], the Chief of the Helicopter Program Office, and a second from [***], a contractor who served as a technical advisor to the Helicopter Program Office.[7] ECF No. 35-1. [***]'s declaration asserts that the Air Force's consideration of whether any of the potential offerors could complete any of the helicopter upgrades in a timely manner without the TDP is reflected in the current administrative record. *Id.* [***], on the other hand, explained (1) that he was the product support contractor who provided the estimate in the J&A of how long it would take an offeror to complete the CRH upgrade requirements without the TDP, and (2) how he reached his conclusion. *Id.* Additionally, on June 7, 2021, all of the parties filed

---

[7] The Court generally does not consider post-hoc rationalizations in evaluating an agency's decision. *See, e.g., Allied Tech. Grp., Inc. v. United States*, 92 Fed. Cl. 226, 229–30 (2010) ("The record should not include materials created or obtained subsequent to the agency's decision."); *see also Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (holding that the "focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA"). Because SNC consented to the motion, however, the Court will consider the declarations the government submitted to the extent that they explain existing information in the administrative record, but not if they add new facts. ECF No. 35.

supplemental briefs to address the relationship between the scope of the J&A and the scope of the intended sole-source award. ECF Nos. 37–39.

## III. Jurisdiction and Standing

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, provides this Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In a pre-award solicitation protest, an interested party is "'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract.'" *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015) (quoting *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1299 (Fed. Cir. 2001)). A prospective bidder is one who, but for the alleged deficiencies in the procurement process, would have submitted a bid and diligently pursues its interests before the solicitation period ends. *CGI Fed.*, 779 F.3d at 1349–51; *see MLS-Multinational Logistic Servs., Ltd. v. United States*, 143 Fed. Cl. 341, 356–59 (2019). There is no dispute that SNC is a prospective bidder – and thus an interested party – within the meaning of the statute. No party contests this Court's jurisdiction in this case, and the Court concludes that there are no jurisdictional impediments to deciding SNC's claims on the merits.

## IV. Standard of Review

Judgment on the administrative record pursuant to RCFC 52.1 "is properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354. The Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the record evidence. *Id.* at 1356–57.

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). Pursuant to the APA standard of review, the Court asks "whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)). The Court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).

"When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal citations omitted). The Court thus must determine whether "the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.– Birmingham v. United States,* 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency's decision also may be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider." *Technica LLC v. United States*, 142 Fed. Cl. 149, 154 (2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

"When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (citing *Kentron Hawaii, Ltd. V. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). "When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001).

## V.    Discussion

The Competition in Contracting Act ("CICA") requires agencies, in conducting "a procurement for property or services," to use competitive procedures to obtain "full and open competition." 10 U.S.C. § 2304(a)(1). An agency may be exempt from this requirement when the property or services "are available from only one responsible source . . . and no other type of property or services will satisfy the needs of the agency." 10 U.S.C. § 2304(c)(1). The FAR thus permits an agency to award a sole-source contract where the supplies or services to be acquired are "available only from the original source in the case of a follow-on contract for the continued development or production of a major system or highly specialized equipment, . . . when it is likely that award to any other source would result in . . . [u]nacceptable delays in fulfilling the agency's requirements." FAR 6.302-1(a)(2)(ii)(B) (supplies); FAR 6.302-1(a)(2)(iii)(B) (services).

Prior to awarding a sole-source contract, a contracting officer must: (1) justify the sole-source award in writing; (2) certify the "accuracy and completeness of the justification"; and (3) obtain the approval of the senior procurement executive of the agency. FAR 6.303-1(a). Each justification must "contain sufficient facts and rationale

to justify the use of the specific authority cited," including "[a] demonstration that the proposed contractor's unique qualifications or the nature of the acquisition requires use of the authority cited," "[a] description of efforts made to ensure that offers are solicited from as many potential sources as is practicable," [a] determination by the contracting officer that the anticipated cost to the Government will be fair and reasonable," "[a] description of the market research conducted," and "[a]ny other facts supporting the use of other than full and open competition." FAR 6.303-2. For situations in which access to technical data hinders the agency's ability to compete a contract, the justification should also include an "[e]xplanation of why technical data packages, specifications, engineering descriptions, statements of work, or purchase descriptions suitable for full and open competition have not been developed or are not available." FAR 6.303-2(b)(9)(i). As discussed, *supra*, the Court will sustain a challenge to an agency's decision only if the agency acted in a manner that was arbitrary, capricious, or contrary to law. *Nat'l Gov't Servs., Inc.*, 923 F.3d at 981.

SNC alleges that the Air Force acted in a manner that was arbitrary, capricious, and contrary to law by failing to (1) meaningfully consider SNC's capabilities as described in its May 2020 submission in response to the SSS, (2) update the J&A based upon that submission, and (3) engage in reasonable advance planning to mitigate the unavailability of the TDP. Compl. at 19, 23, 28. SNC further argues that the Air Force unreasonably determined that Sikorsky was the only source that could satisfy the Agency's requirements in a timely manner. *Id*. at 24. Although the Court rejects many of SNC's arguments, the Court concludes that the J&A does not justify a sole-source award of a multi-year, single award ID/IQ contract.

### A. The Air Force Was Not Required To Consider SNC's Second Submission[8]

As discussed *supra*, FAR 6.302-1(a)(2) permits an agency to award a sole-source contract – and thus avoid the requirement to conduct full and open competition – "[w]hen the supplies or services required by the agency are available from only one responsible source . . . , and no other type of supplies or services will satisfy agency requirements." FAR 6.303-1(a)(2), in turn, provides that "[a] contracting officer shall not commence negotiations for a sole source contract . . . or award any other contract without providing for full and open competition unless the contracting officer . . . [c]ertifies the accuracy and completeness of the justification." FAR 6.303-1(c) similarly requires that "[t]echnical and requirements personnel are responsible for providing and

---

[8] The first two counts of SNC's complaint allege that: (1) the Air Force failed to meaningfully consider its capabilities, and (2) the Air Force violated the FAR by incorrectly certifying the J&A as accurate and complete. Compl. at 19, 23. Both counts are arguments regarding the Air Force's consideration of SNC's second response to the SSS. *Id*. Accordingly, the Court addresses them together.

certifying as accurate and complete necessary data to support their recommendation for other than full and open competition." SNC alleges that the Agency violated FAR 6.303-1(a)(2) and FAR 6.303-1(c) by not considering SNC's May 2020 response to the SSS. Compl. at 23; Pl. MJAR at 26–27. SNC contends that because the Air Force did not revise and update the J&A to account for SNC's second response, the J&A was not accurate and complete as required by FAR 6.303-1(a)(2). Pl. MJAR at 26–27, n.6.

SNC further contends that the Air Force violated FAR 5.207(c)(16)(ii), which provides that when an agency makes a sole-source award in reliance on FAR 6.302-1, the agency must allow all responsible sources to "submit a capability statement, proposal, or quotation, which shall be considered by the agency." Compl. ¶ 43. SNC posits that because the Air Force did not properly consider SNC's second submission, the Agency violated the FAR's mandate to meaningfully consider SNC's capability statement. Compl. ¶¶ 41–48. For the reasons discussed below, the Court rejects SNC's arguments.

*First*, the Air Force never committed to reviewing SNC's second submission. SNC relies on several conversations with the Contracting Officer as putative evidence that she approved SNC's request to make a second submission in response to the Agency's SSS. Pl. MJAR at 25. In particular, SNC cites the following statements from the Contracting Officer as evidence that she agreed to review SNC's second submission: "We did receive your submission; thank you. We will let you know if we have any questions or need any clarification as we review. I'll be in touch if we'd like to set up a meeting." Pl. MJAR at 11, 25–26; AR 327. This language, however, is nothing more than a perfunctory acknowledgment that the Air Force received SNC's second submission. In fact, despite SNC's allegation that "[t]he Contracting Officer for the CRH capability upgrades program approved SNC's request to make a second submission to the SSS[,]" SNC's only express request to submit a second response went unanswered by the Contracting Officer. Compl. ¶ 5; AR 353. Moreover, that request was transmitted in March 2020, and two months elapsed before SNC finally submitted its second response. AR 299, 353. There is thus no evidence in the record to support SNC's claim that the Agency affirmatively agreed to review a second submission in response to the SSS.

*Second*, even if the Air Force had committed to reviewing SNC's second submission, it was untimely. The Air Force issued the SSS on October 1, 2019, with an October 25, 2019 deadline for responses. AR 3. At Industry Day less than one month later, the government advised SNC that it "should provide a more detailed response" given that SNC mainly focused on a single capability upgrade – Degraded Visual Environment – rather than providing the Air Force a more comprehensive briefing on SNC's capabilities. AR 4. The second, May 2020 submission that SNC contends the Air Force should have considered was submitted almost *seven months* after the initial deadline for responses to the SSS. AR 299. During that time, the Air Force conducted

extensive market research – performing both its own independent research on SNC's capabilities and utilizing SNC's first submission – before determining that SNC (or, for that matter, any other contractor) would require a TDP in order to complete the CRH upgrades in a timely manner. AR 11, 15. While the Air Force suggested in November 2019 that SNC provide additional information regarding its capabilities, the Air Force could not reasonably have been expected to put its procurement planning on hold for months while SNC revised or supplemented its initial response.[9] AR 11–12, 19.

*Third*, the Air Force meaningfully considered SNC's capabilities even without evaluating SNC's May 2020 submission. Accordingly, even if the Air Force had been required to review SNC's second submission, but failed to do so, SNC was not prejudiced. SNC asserts that "had the Air Force actually and meaningfully reviewed SNC's May 15, 2020 Response to the SSS *before* final approval in January 2021 of the J&A, it would have recognized that SNC can provide timely capability upgrades *with or without* Sikorsky's TDP." Compl. ¶ 12 (emphasis in original). The Air Force, however, recognized that while several other sources theoretically could provide the capability upgrades without the TDP, they could not do so without unacceptable risk and delay.[10] AR 146. In fact, the Air Force arrived at this conclusion after receiving SNC's first response in which SNC addressed that very issue: SNC informed the Air Force that it could "[***] remove *a lot* of the data requirements." AR 295 (emphasis added). SNC's second submission thus did not provide new information that would have changed the Agency's acquisition strategy as articulated in the J&A, given that the Air Force already was aware of SNC's purported ability to perform without the TDP. Moreover, Sikorsky correctly points out that while SNC had asserted that it could remove "a lot" of the data requirements, "[r]emoving 'a lot' of the data requirements is not the same as removing 'all' or even most of them. SNC thus did not state it could deliver a 'complete' TDP." Intv. Resp. at 8 (citing AR 313). Thus, even assuming *arguendo* that the Air Force was required to review SNC's untimely second submission – which the Court concludes the Air Force was under no obligation to do – SNC still has failed to demonstrate that such

---

[9] SNC alleges that, "[i]n speaking with [the Contracting Officer] in April, SNC requested and was granted an exception to the due date for the SSS." Pl. MJAR at 9 (citing AR 299). The Contracting Officer, however, denies having any record or recollection of such a conversation. AR 12. Additionally, the record is devoid of evidence supporting SNC's assertion.

[10] SNC attempts to rebut this conclusion by asserting that it is "capable of accomplishing a TDP in [***], as it previously did on the [***] aircraft project discussed in its May 2020 Response." Pl. MJAR at 29 (emphasis omitted) (citing AR 309–10). SNC, however, did not provide this information in its May 2020 submission, and, even within SNC's MJAR, SNC provides no evidence that the [***] aircraft project and the CRH project are comparable. The Court thus declines to second-guess the Air Force's conclusion that SNC could not realistically accomplish this feat in [***].

an error would have impacted the Air Force's recommendation to proceed with a sole-source acquisition.[11]

## B. The Air Force Engaged In Reasonable Advance Planning

SNC asserts that "had the Air Force engaged in reasonable advanced planning, it would have taken reasonable and appropriate steps to resolve the TDP dispute with Sikorsky *at some point within the past year*." Compl. ¶ 66 (emphasis in original). SNC thus contends that "the Air Force's dilatory tactics" constitute a lack of reasonable advanced planning in violation of CICA's mandate. Pl. MJAR at 34; Compl. ¶¶ 64–65.

CICA prohibits an agency from justifying a sole-source award "on the basis of the lack of advance planning." 10 U.S.C. § 2304(f)(4). Courts have qualified that rule, however, in explaining that "procurement planning 'need not be entirely error-free or even actually successful. All that is required is that the planning actions be reasonable.'" *Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 398 (2008) (quoting *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 239, 258 (1999)).

Sikorsky is required to deliver a TDP in "late Spring 2021" pursuant to the company's current contract with the government. AR 360. The government, however, asserts that delivery of the TDP is delayed (or may be delayed) due to an ongoing dispute with Sikorsky over the scope of data rights:

> In ongoing negotiations, Sikorsky maintains that a comprehensive "total package" agreement is required before it will deliver any portion of the TDP. The Government has not granted Sikorsky relief from the contractual requirement to deliver the TDP by Spring 2021, but based on the combination of the impasses associated with the Government's attempt to reach agreement on the TDP scope and the fact that the Government has been told that Sikorsky is waiting to solicit TDP data from suppliers until the agreement is reached, the Government expects Sikorsky will

---

[11] The government further asserts that "since the filing of the [GAO] protest, the technical team has thoroughly reviewed SNC's May 2020 response and has still concluded that SNC is not capable of performing the requirements absent an unlimited CRH TDP." Def. MJAR at 19–20 (citing AR 12). While the Court does not consider *post-hoc* explanations when evaluating the sufficiency of a J&A, *see Allied Tech. Grp., Inc.*, 92 Fed. Cl. at 229–30, we note that this review supports the conclusion that SNC was not prejudiced by the Air Force's failure to review its late submission. Even if the Court were to have found that the Agency should have reviewed this submission – which we do not – the Court sees little point in remanding this matter back to the Agency to consider a document that the Agency clearly already has considered.

> not be able to deliver the TDP by Spring 2021. The Government will respond appropriately if Sikorsky fails to meet its contractual delivery requirements.

AR 361; *see also* AR 112 (indicating that "[Helicopter Program Office] and [Sikorsky] not aligned on TDP scope . . . , Detailed Manufacturing and Process Data definition & delivery, legacy data"); Intv. MJAR at 28. During oral argument, the government further clarified that:

> This is . . . a good faith dispute over data rights, the data rights in the TDP. And the Government has put together a team specifically to address these issues with Sikorsky and to defend the Government's data rights. That's really what the issue here is, that the Government is defending its rights to this data that the Government's money created this technology and it has rights to the technology. Sikorsky is arguing against the Government and the Government is addressing it, *but there's no breach yet.*

Tr. 25:7–18 (emphasis added). The government also clarified that because the TDP is due ninety days after a "system verification review" is complete, Sikorsky is *not* currently late in delivering the TDP and, therefore, is not in breach of the agreement. Tr. 12:19–13:18.

The Court thus rejects SNC's contention that the Air Force failed to engage in reasonable advance planning. The record supports the Air Force's determination, based on industry feedback and its own independent research, that a full TDP is required complete the CRH upgrades in a timely manner. AR 98. At the time that the Air Force published the SSS and drafted the J&A, the Agency believed that Sikorsky would provide the TDP on the contractually prescribed timeline. It still may do so. The fact that the Air Force subsequently realized that a data rights dispute between the government and Sikorsky may delay the delivery of the TDP does not constitute a lack of advance planning. To the contrary, if anything, the Air Force actively and *currently* is trying to mitigate any problems by engaging in advance planning to address an anticipated problem that has yet to materialize: Sikorsky's breach of its contractual obligation to deliver the TDP. Tr. 13:17–18 ("But as of right now, the TDP is not late. Sikorsky is not late in delivering it."). Accordingly, and absent any evidence in the record that the dispute between the government and Sikorsky is *not* in good faith (*e.g.*, the product of collusion to justify the sole-source contract), the Court concludes that the Agency's advance planning was reasonable.

## C. The J&A Does Not Justify A Sole-Source, Single Award ID/IQ Contract To Sikorsky For The Currently Planned Duration

Notwithstanding the above conclusions, the Court agrees with SNC that the J&A does not justify a long-term, $980 million, sole-source, single award ID/IQ to Sikorsky. Compl. ¶¶ 11, 62; Pl. MJAR at 22. Although the record generally supports a sole-source award to Sikorsky if and when the TDP is not delivered in a timely manner – and during any subsequent period in which the TDP remains unavailable – the Court concludes that the scope of the contemplated contract exceeds the government's demonstrated need. *See Barnes Aerospace Grp.*, B-298864, 2006 CPD ¶ 204, 2006 WL 3849071 (Dec. 26, 2006) (holding that "it was unreasonable for the Air Force to justify this award for a two-year base period"); *Pac. Sky Supply, Inc.*, B-228049, 87-2 CPD ¶ 504, 1987 WL 103141 (Nov. 23, 1987) (finding that the Air Force's broad discretion "does not cover the use of an extended time period for which the agency's justification provides no basis" and, thus, that the "scope of the procurement [was] excessive and unwarranted").

To support a sole-source award to Sikorsky, the Agency in the J&A relied upon "10 U.S.C. § 2304(c)(1) as implemented by FAR 6.302-1(a)(2)(ii)" and FAR 6.303-2(b)(4), discussed *supra*. AR 143. In particular, the Air Force in the J&A concluded that "Sikorsky is the only responsible source for this follow-on contract for the continued development and production of a major system because award to any other source would result in unacceptable delays in fulfilling the Government's requirements." AR 143. That determination, in turn, was based upon the assessment that although "the requirement for a complete and releasable TDP was confirmed during FAR Part 10 market research," the Agency ultimately may not obtain a timely TDP due to a dispute with Sikorsky. AR 144 ("At present, the contractor has not refused to deliver the TDP, however, the Government and contractor are in dispute regarding the data rights and content of the TDP and software (specifically related to source code)."). The Agency further explained that "[a]s the CRH Original Equipment Manufacturer (OEM), Sikorsky Aircraft Corporation has unique and specialized systems engineering and manufacturing, configuration management, and technical data experience and expertise." AR 143. The Agency thus concluded that "Sikorsky has an exclusive understanding of the design and implementation of the technical architecture," making it "the only industry source that can adequately address the Government's requirements" in light of the timing requirements and in the absence of a generally available TDP. *Id*. The Air Force concluded that "Sikorsky is the only contractor in possession of the technical expertise, technical data, system-level and sub-system source code, and detailed knowledge . . . to successfully perform these critical processes and meet the full range of CU requirements." *Id*.

The Court tests those factual assertions (and conclusions) in the J&A against the administrative record, pursuant to the APA's standard of review. *See, e.g., AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1334 (Fed. Cir. 2018) (finding sufficient support in the administrative record to support the J&A's assertions). Conclusions that lack a factual basis are, by definition, arbitrary and capricious. *See, e.g., Innovation Dev. Enterprises of Am., Inc. v. United States,* 108 Fed. Cl. 711, 728–29 (2013) (holding that the Air Force's sole-source award was arbitrary and capricious because, among other reasons, the J&A rested on factual conclusions that were unexplained and unsupported by the record).

Despite the fact that the Agency still anticipates delivery of the TDP in "[***]," the Air Force rather inexplicably "contemplates award of a five-year ordering period ID/IQ contract with an estimated ceiling of $980.7M and a "contemplated delivery period [of] seven years." AR 142, 361. The Air Force rationalizes this sole-source, multi-year contract by emphasizing that a six to eight-year delay would result if another source, lacking a complete TDP, had to reverse-engineer the technology necessary to complete the anticipated upgrades. AR 144. In that regard, the J&A posits:

> FAR Part 10 market research confirmed that there is only one qualified source (i.e., the OEM) capable of completing all five phases absent a complete TDP. If the program office was required to develop an alternative source to the OEM (as mitigation to TDP availability), the CRH program would experience an unacceptable delay estimated at a minimum of 6 to 8 years. This delay encompasses the time required to conduct a source selection (~1 to 2 years); develop a second source with comparable systems engineering, systems integration and verification, and field support qualifications; and qualify and verify the new source's facilities, personnel, processes and procedures comparable to Sikorsky's existing production infrastructure after selection and contract award (~5 to 6 years).

AR 144. Furthermore, despite the Agency's determination that [***] other offerors are generally capable of performing the anticipated CRH upgrades, the Agency asserts that those "capability determinations . . . were made with the assumption the TDP would be available[.]" AR 146 (noting that "each contactor confirmed a need for a comprehensive TDP, which the Government currently does not have"). The J&A thus ultimately concludes that "[w]ithout a complete and releasable TDP, . . . award to any contractor other than Sikorsky at this time would result in unacceptable delays." AR 146.

The Air Force thus concludes that a sole-source, *multi-year* award to Sikorsky – for a contract with an estimated ceiling of almost one billion dollars – is justified based

on the *current* unavailability of a TDP, notwithstanding that the Agency still expects Sikorsky to deliver the TDP at some point between spring 2021 and [***]. AR 142. In that regard, while the J&A and the administrative record demonstrate that the timing of the TDP delivery is somewhat uncertain, the TDP may be available in the near future. *Compare* AR 145 (noting that although "incremental deliveries of TDP components could occur in late-Spring 2021, the timeframe for receipt of the technical data may not support competitive options"), *with* AR 146 ("delivery of the [] full TDP . . . is not anticipated until late spring of 2021"), AR 361 ("[***] is the earliest Sikorsky could deliver a complete and useable TDP").

As a threshold matter, the Court finds instructive GAO decisions, holding expressly that the unavailability of a TDP may provide a rational basis for an agency to award a sole-source contract. For instance, in *Raytheon Co.-Integrated Def. Sys.*, B-400610, 2009 CPD ¶ 8, 2008 WL 5473622 (Dec. 22, 2008), the GAO held that "[w]here an agency does not possess a TDP adequate for competition, the agency may procure its requirement on a sole-source basis from a contractor whose prior experience *reduces the risk to the agency that its needs will not be timely met.*" (emphasis added). The GAO explained:

> This is so, even where, given less stringent deadlines, other contractors might as ably perform. Where the protester is at a technical disadvantage to the proposed sole-source recipient, and the record shows that the protester could not remedy its technological deficit and meet the time frame established by the agency, we will not object to the proposed sole-source award.

*Raytheon Co.-Integrated Def. Sys.*, B-400610 at *5, (citing *Kollsman, A Div. of Sequa Corp.; Applied Data Tech., Inc.*, B-243113, 91-2 CPD ¶ 18, 1991 WL 133926 (July 3, 1991) and *Tri–Ex Tower Corp.*, B–239628, 90-2 CPD ¶ 221, 1990 WL 278490 at 5 (Sept. 17, 1990)). The Court agrees with those general principles, but does not agree that they dictate a decision in the government's favor here.

In this case, while the Agency's market research indeed identified [***] other contractors capable of performing the CRH upgrades, those "capability determinations . . . were made with the assumption the TDP would be available[.]" AR 146. Again, the Court agrees with the government that there is no evidence in the record to suggest that the TDP's current unavailability is due to anything other than a good faith dispute between the government and Sikorsky over data rights or the fact that the contractual deadline for the TDP has not yet arrived. AR 144. Furthermore, there is ample support in the record for the Agency's conclusion in its J&A that Sikorsky is currently the only contractor in possession of the technical data necessary to complete the CRH upgrades in a timely fashion, if we assume the TDP is never delivered. AR 143. The Court thus

finds generally reasonable the Agency's conclusion that, *at present*, Sikorsky is the only contractor capable of performing the upgrades immediately.

But that is not the end of the Court's inquiry. In that regard, the critical problem for the Agency is that the J&A simply does not explain how the *current* unavailability of a TDP justifies a sole-source award for the entirety of the CRH upgrade contract, which contemplates a five-year order period and a seven-year delivery period. That omission is particularly glaring in light of the government's admission that Sikorsky is contractually required to provide a full TDP in the near future, at which time [***] other contractors will be capable of performing the CRH upgrades. Def. MJAR at 5 (citing AR 360). The government's reliance on the time it would take another contractor to "replicate the OEM's knowledge" and perform without a TDP (*i.e.*, six to eight years[12]) may be true, but it is orthogonal to the problem given the Agency's representations that the TDP is perhaps imminently forthcoming. The J&A was drafted in 2019, projecting a TDP delivery of late spring 2021. Tr. 13:21. Even now, counsel for the United States agrees that "the TDP will be due 90 days after" a system verification – currently underway – "is complete." Tr. 13:10–12 (representing that the verification process is "happening now"). Thus, the government agreed that "it's going to be *a little later* than late spring 2021." *Id*. 13:11–12 (emphasis added). Even considering a data rights dispute between Sikorsky and the government, which "could realistically slip delivery of the TDP to [***]," the J&A's conclusion that a sole-source award is necessary for five years is irrational. AR 46. In fact, the Agency has continuously maintained that "[t]he Air Force will respond appropriately in the event that [TDP] delivery is not in accordance with the timetables in the contract[,]" AR 46, which, again, the Court notes should have occurred as early as spring 2021 and perhaps will occur before [***]. AR 361. In sum, the Agency is simply trying to mitigate the potential harm from "an anticipated delay" that "hasn't happened yet" and may never happen. Tr. 13:19–25.

Accordingly, the J&A's conclusion that a *multi-year*, sole-source award to Sikorsky is justified based on the present unavailability of the TDP is entirely unsupported by the record. *Innovation Dev. Enterprises of Am.*, 108 Fed. Cl. at 728–33 (finding the Air Force's sole-source award arbitrary and capricious because, among other reasons, the J&A rested on unsupported factual conclusions); *cf. AgustaWestland N. Am., Inc.*, 880 F.3d at 1326 (holding that the administrative record provided sufficient factual support for the J&A's determination that an award to any other source would result in unacceptable delays).

To mitigate competition concerns resulting from the present unavailability of the TDP, the Agency claims to have built a "safety valve" into its intended sole-source award to Sikorsky that would preserve competition in the future (*i.e.*, once the Agency has the TDP). Def. MJAR at 15 (citing AR 9). Specifically, the government argues that

---

[12] Tr. 56:11–12 ("[W]ithout a TDP it would take six to eight years, yes.").

"[i]n order to ensure that competition could be achieved at the earliest possible moment, a formalized process was created and included in the J&A language to ensure that the J&A is only utilized when absolutely necessary up until such time that [an] unlimited CRH TDP is available." Def. MJAR at 8 (citing AR 8–9). The J&A describes the putative process in great detail:

> As set forth in Section Ill above, delivery orders under the CRH CU ID/IQ will be subject to the following prerequisites: (1) Determination of data availability to support a full and open competition for the underlying requirement, (2) If the CRH's data posture has changed from point of award of the CU contract, completion of market research to confirm if competitive options exist in light of the new data baseline, (3) Documentation, of the above and other circumstances, to confirm that no other exception. to full and open competition applies, (4) Receipt of Program Executive Officer approval prior to Request for Proposal release, and (5) Pursuant to FAR 5.201, release of a notice of contract action in advance of DO award. Prior to executing a DO without competition, SAFI AQCC: and SAF/AQCK will be notified that adequate TDPs are unavailable to conduct a competition. Notification should include an explanation for the lack of TDP availability and specifically any rationale provided by Sikorsky. This will ensure that competition is used to the maximum extent practicable.

AR 147; *see also* Tr. 18:10–12 (arguing that the Agency has committed to competing the delivery orders once Sikorsky provides the complete TDP).

While the Agency's commitment is clearly designed to give Sikorsky's would-be competitors (and perhaps the Court) some measure of comfort, the government admits that its promise to compete future delivery orders is an empty one that cannot be enforced. Tr. 18:2–5 ("[I]t's a voluntary process by high-level Air Force officials overseeing this process to make sure that these requirements can be competed as soon as the TDP becomes available."). Indeed, Sikorsky correctly concedes that no offeror would be able to challenge later delivery orders due to the task order protest bar. ECF No. 38 at 2–4. An unenforceable promise to compete future delivery orders, however, is insufficient to comply with CICA's requirements. Moreover, when pressed by the Court as to whether the United States would be prejudiced if the Court made such a competition scheme enforceable via a permanent injunction, the government replied that "[i]f the injunction is clear that it's based on when the TDP becomes available, then

that's exactly what the United States is interested in doing." Tr. 19:24–20:1. In other words, the government will not be prejudiced by an injunction that holds the United States to its commitment.[13]

Outside of the Agency's unenforceable "safety valve," the Air Force failed to meaningfully consider other mechanisms – including the use of contract vehicles other than a sole-source ID/IQ – to mitigate the current unavailability of the TDP. *See EOD Tech., Inc. v. United States*, 82 Fed. Cl. 12, 21 (2008) ("[T]he Army's consideration of alternatives is at least partially deficient because it does not realistically consider multi-award contracts.").[14] During the March 2020 ESIS, the Air Force team briefly discussed alternative procurement approaches and their associated advantages and disadvantages, including a multiple award ID/IQ contract. AR 6, 101. According to the ESIS team, every course of action aside from a sole-source ID/IQ contract did "not mitigate resolution of technical data availability issues." AR 101. This conclusion, however, is a red herring. While a multiple award ID/IQ contract may not mitigate the *current* unavailability of the TDP, a multiple award contract vehicle would allow for full and open competition as soon as the TDP becomes available – a resolution which the Agency vehemently claims it aims to "achieve[] at the earliest possible moment." Def. MJAR at 8 (citing and quoting AR 9).

The only other rationale that the Agency offered for refusing a multiple award contract vehicle was that it would "[r]equire[] Government integration of effort across multiple industry sources [and] [i]ncur[] greater administrative burden." AR 101. The Court concurs with the GAO, which has rejected an almost identical explanation:

> The agency has broad discretion concerning the establishment of its minimum needs with respect to the

---

[13] The government, in its response brief, argues that "[t]he fact that the Air Force recognized the need for tailoring the J&A here based on the facts of what led to the sole-source justification, and that the Air Force ensured there was a formal mechanism to break away from the sole-source environment as soon as possible, is further evidence that its award decision has a rational basis and is not arbitrary." Def. Resp. at 13. Furthermore, the government criticizes SNC for failing to mention the so-called "safety valve" and asserts that "[t]he purpose of the safety valve is to make the ID/IQ contract with Sikorsky less than (and, hopefully, significantly less than) [the $980 million] amount." *Id.* This is overselling at its finest. When compared to SNC's briefs on the subject, the Court is far more troubled by the government's suggestion that there is some sort of "formal mechanism" that would constrain the government's future conduct, when all there appears to be are unenforceable planned process statements in the J&A itself. The Court rejects the government's reliance on this so-called "safety valve," which, if anything, demonstrates the problem with the overly-broad J&A and planned sole-source award.

[14] Counsel for the United States admits that the Agency's J&A did not address "the possibility of a multiple-award IDIQ." Tr. 20:7-14.

> number of years for which a contract is required. Kings Point Mfg. Co., Inc., B–220224, Dec. 17, 1985, 85–2 C.P.D. ¶ 680. However, this discretion does not cover the use of an extended time period for which the agency's justification provides no basis, but rather implies the *need for administrative convenience in the face of the burden of complying with CICA requirements as the only reason for the 5–year term*.

*Pac. Sky Supply, Inc.*, B-228049, 87-2 CPD ¶ 504, 1987 WL 103141 (Nov. 23, 1987) (emphasis added). CICA's mandate for full and open competition is not excused simply because a sole-source award avoids additional, future effort on the part of the Agency.[15]

The Agency similarly failed to consider whether waiting a short period of time to allow for the possible resolution of the TDP issue would obviate the putative need for the sole-source award to Sikorsky. While the J&A repeatedly invokes an immediate need to begin the upgrades – thus precluding any source other than Sikorsky from performing the work – this conclusion is critically undermined by the record. The J&A emphasizes that "[***] of the [***] CU candidates have initiated the acquisition process for incorporation into the legacy HH-60G system in order to combat real-world threats which demonstrates the immediate need for incorporation into the CRH." AR 142. The J&A thus asserts that "[t]he first capability modification [***] must commence in FY21" in order to support warfighter needs. AR 142. A contemporaneous Acquisition Strategy Annex executed in July 2020, however, estimates a contract award "in the First Quarter of Fiscal Year (FY) 2022." AR 790. A timeline estimation table similarly shows a "Pre-Award Phase" extending through the beginning of FY 2022. *Id*. at Figure 1. The record thus refutes the J&A's naked assertion that the initial upgrades are so urgent as to preclude the Agency's waiting until the end of FY 2021 or perhaps the first quarter of FY 2022 before proceeding with any sole-source award.

* * * *

In sum, the Court concludes that SNC has succeeded on the merits of its

---

[15] The government also maintains that its preferred contract vehicle – a sole-source ID/IQ to Sikorsky – is equally as effective as a multiple award contract because once the Air Force receives the TDP, "it will stop using the sole source ID/IQ to reap the benefits of competing the requirements." Def. Resp. at 13 (citing AR 24, 143, 147); *see also* Tr. 23:6–10 (noting that "because an IDIQ contract can be terminated very easily for convenience, it's not impenetrable" and arguing that "[t]he solutions are really the same in mechanism in that once the TDP becomes available, the Air Force starts competing these requirements"). If the two contracts really are "the same in mechanism," the Air Force should pursue the procurement approach that actually guarantees competition once the TDP is available.

complaint to the extent that: (1) the administrative record demonstrates that there is no need to proceed with any sole-source contract award to Sikorsky immediately and perhaps not until late FY 2021 or even early FY 2022; (2) the agency failed to demonstrate with record evidence why, even if a sole-source contract were needed immediately, it should cover more than the first three capability upgrades (a new J&A may be issued for further sole-source contracts or delivery orders if the TDP remains unavailable);[16] and (3) the J&A does not address why a multiple award ID/IQ contract would not address the Agency's timing concerns, particularly where the delivery orders could be issued on a sole-source basis to Sikorsky until such time that the TDP is available, a result the government represents it is intent on achieving in any event.[17] The government's sole-source award to Sikorsky (at least as planned) is, thus, arbitrary and capricious or otherwise contrary to law.

### D. Injunctive Relief Is Warranted

The Tucker Act vests this Court with authority to award "any relief that the court considers proper, including . . . injunctive relief." 28 U.S.C. § 1491(b)(2); *see* RCFC 65. In evaluating whether permanent injunctive relief is warranted in a particular case, a court must consider: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown irreparable harm without the issuance of the injunction; (3) whether the balance of the harms favors the award of injunctive relief; and (4) whether the injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *see CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494–96 (2013) (applying these four factors to an agency award of an ID/IQ contract).

SNC has succeeded on the merits of its central claim. Additionally, SNC has

---

[16] Although the J&A may assert that later, planned upgrades are somehow tied to the initial upgrades, AR 142, the government inexplicably never reconciles how that assertion is consistent with its promise to compete delivery orders as soon as a TDP is available. Moreover, the government concedes that "the Air Force never asked any of those qualified competitors, those capable competitors, are there any of these potential [upgrade] items that you could do without [the] TDP[]." Tr. 57:15–20. Counsel for the United States asserts that such a question was unnecessary because "the Air Force concluded" – in the J&A itself – "that the full TDP was needed" for each and every upgrade. Tr. 58:23–25; 59:1–3. There is no supporting documentation in the contemporaneous administrative record supporting that conclusion beyond the J&A's *ipse dixit*. Although [***]'s unopposed declaration sheds some additional light on the subject, ECF No. 5-1 at ¶ 3, it cannot save the Agency's intended sole-source award given the Court's findings.

[17] An agency's actions may be arbitrary if, in making a decision, the agency "entirely failed to consider an important aspect of the problem." *Ala. Aircraft Indus., Inc.*, 586 F.3d at 1375 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43).

demonstrated irreparable harm. This Court consistently has held that the lost opportunity to compete for a contract constitutes irreparable harm. *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 494 ("The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract."); *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 544 (2010) ("A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm."); *Serco Inc. v. United States*, 81 Fed. Cl. 463, 502 (2008) ("[The loss of valuable business], deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm."). That is particularly true where, as here, there is a five to seven-year contract on the line worth upwards of (potentially) almost $1 billion. Accordingly, the Court holds that the second injunctive relief factor favors SNC. Similarly, an injunction to enforce procurement law and preserve competition as much as possible serves the public interest. *Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 429 (2018) ("An important public interest is served through conducting 'honest, open, and fair competition' under the FAR, because such competition improves the overall value delivered to the government in the long term." (quoting *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 495)); *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 495 ("'The public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" (quoting *PGBA, LLC*, 57 Fed. Cl. at 663)); *see also MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000) ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system."). Thus, the Court concludes that the fourth factor favors SNC, as well.

What gives the Court pause, however, is the balance of the harms factor, specifically in light of the statutory admonition that the Court consider national defense and security in resolving a bid protest or issuing an injunction. *See* 28 U.S.C. § 1491(b)(3); *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 368 (2009) (quoting 28 U.S.C. § 1491(b)(3) for the proposition that "this Court is statutorily required to 'give due regard to the interests of national defense and national security and the need for expeditious resolution' in resolving a bid protest"). Although the United States unsatisfactorily relies almost, if not entirely upon the *ipse dixit* of the J&A in opposing a permanent injunction in this case, the Court is ill-positioned to fashion injunctive relief that accounts for the legitimate needs of the Air Force. Particularly given the critical role of the CRH program, the Court is reluctant to impose any permanent injunction without further factual development regarding the appropriate scope of relief given the Court's conclusions. In the meantime, the Agency is enjoined from proceeding with the sole-source award as contemplated. Although the final terms of an injunction have yet to be decided, the Court permanently enjoins the United States from proceeding with any delivery orders without competition, *once the TDP is available*. Such relief was all but agreed to by counsel of record for the United States, in any event.

## VI. Conclusion

For the above reasons, the Court **GRANTS** SNC's motion for judgment on the administrative record, **DENIES** the government's motion for judgment on the administrative record, and **DENIES** Sikorsky's motion for judgment on the administrative record.

In light of the Court's findings and conclusions above, the Court orders the United States to propose the terms of a permanent injunction that will adequately address the Court's conclusions on the merits, as enumerated *supra*. The government shall file such proposed terms in a status report on or before July 15, 2021, and shall meet-and-confer with both SNC and Sikorsky to determine whether either party will oppose the government's proposed specific terms of injunctive relief. Should either party oppose the government's proposed terms, such party will have one week to file any responsive brief, which shall not exceed five (5) pages. The government's submission of proposed terms of injunctive relief (pursuant to this opinion and order) shall not, of course, constitute any waiver of its appellate rights.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge